# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

JACQUELINE JEAN PEARSON,    :
      :
      Plaintiff    :    No. 3:15-CV-0300
      :
      vs.    :    (Judge Nealon)
      :
CAROLYN W. COLVIN, Acting    :
Commissioner of Social Security,    :
      :
      Defendant    :

FILED
SCRANTON

JUL 2 6 2016

Per_____ DEPUTY CLERK

## MEMORANDUM

On February 10, 2015, Plaintiff, Carrie Ann Bell, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be affirmed.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on February 6, 2012, alleging disability beginning on January 1, 2012 due to chronic back, neck, and leg pain and panic attacks. (Tr. 34, 79).[4] These claims were initially denied by the Bureau of Disability Determination ("BDD")[5] on June 8, 2012. (Tr. 34). On June 19, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 34). An oral hearing was held on August 13, 2013, before administrative law judge Susan L. Torres, ("ALJ"), at which Plaintiff and an impartial vocational expert, Josephine A. Doherty, ("VE"), testified. (Tr. 34). On September 9, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff was capable of performing light work with limitations. (Tr. 31-49).

On November 8, 2013, Plaintiff filed a request for review with the Appeals

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on May 7, 2015. (Doc. 12).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Council. (Tr. 26-27). On December 12, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-7). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on February 10, 2015. (Doc. 1). On May 7, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 11 and 12). Plaintiff filed a brief in support of her complaint on July 30, 2015. (Doc. 16). Defendant filed a brief in opposition on September 1, 2015. (Doc. 17). Plaintiff filed a reply brief on September 21, 2015. (Doc. 18).

Plaintiff was born in the United States on February 8, 1962, and at all times relevant to this matter was considered a "individual closely approaching advanced age."[6] (Tr. 155). Plaintiff obtained her GED in 1980, and can communicate in English. (Tr. 165, 167). Her employment records indicate that she was self-employed as a cleaning lady. (Tr. 160). The records of the SSA reveal that Plaintiff had earnings in the years 1980 through 2002 and 2004 through 2011. (Tr. 144). Her annual earnings range from a low of four hundred sixty-six dollars and thirty-five cents ($466.35) in 1985 to a high of eighteen thousand four hundred

---

6. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

eighty-four dollars and forty-nine cents ($18,484.49) in 1998. (Tr. 144). Her total earnings during these thirty-two (32) years were two hundred sixty-nine thousand two hundred twenty-eight dollars and fifty-two cents ($296,228.52). (Tr. 144).

In a document entitled "Function Report - Adult" filed with the SSA on March 12, 2012, Plaintiff indicated that she lived in a house by herself. (Tr. 173). When asked how her illnesses, injuries, or conditions limited her ability to work, she state that it was painful to lift a two (2) liter bottle, walk upstairs, sit and stand for short periods of time, and drive. (Tr. 173). In terms of self-care, Plaintiff found it difficulty to shower, bathe, get dressed, shave, and use the toilet because all of these activities would cause pain. (Tr. 174). She could prepare meals that were simple, but it would take her an hour and a half because she would have to stop and sit down while cooking. (Tr. 175). She had help from others with doing household chores due to the pain in her legs and back. (Tr. 1175). Plaintiff was able to drive one (1) route, but had others drive when she had to go anywhere other than that one (1) route due to anxiety that would occur going anywhere other than the stops on that route. (Tr. 176, 178). She was able to shop for groceries with accompaniment because she would have panic attacks while doing so. (Tr. 176). She was able to walk for fifteen (15) feet before needing to sit down, and would need to rest for twenty-five (25) minutes before resuming walking. (Tr.

4

178).  Plaintiff used a wheelchair for ambulation when she went out.  (Tr. 179).

When asked to check items which her "illnesses, injuries, or conditions affect,"

Plaintiff did <u>not</u> check seeing, memory, concentration, understanding, following

instructions, or getting along with others.  (Tr. 178).

Regarding concentration and memory, Plaintiff did not need special

reminders to take care of her personal needs, but did need reminders to take her

medicine.  (Tr. 175).  She could pay bills, handle a savings account, use a

checkbook, and count change.  (Tr. 176).  She could pay attention for ten (10)

minutes, followed did not follow spoken instructions well because she would

become panicked and forget, she was sometimes able to finish what she started,

and she did not hand stress or changes in routine well.  (Tr. 178-179).

Socially, Plaintiff would sit outside "on the first step," unable to get down

the other steps due to pain in her legs and back.  (Tr. 176).  She watched very little

television, did not participate in sports, and could not longer engage in prior

hobbies of gardening and signing because of her anxiety and pain in her legs.  (Tr.

177).  People would visit her at home to check on her once a week or less.  (Tr.

177).  She did not go anywhere on a regular basis.  (Tr. 177).  She did not have

problems getting along with family, friends, neighbors, or others.  (Tr.178).

At her oral hearing on August 13, 2013, Plaintiff testified that she was

5

disabled due to a combination of degenerative disc disease and anxiety. (Tr. 61, 71). Her back pain was constant, increased with movement and standing for too long, and was rated at a nine (9) out of ten (10) on the pain scale. (Tr. 66-67). In terms of pain relief, Plaintiff testified that lying down, taking her medication, and ice all helped alleviate the pain, although her pain medication did not really help that much. (Tr. 65, 67). Plaintiff testified that doctors offered her surgery, but that there was a chance of paralyzation and no guarantee the surgery would be successful. (Tr. 71-72). Physical therapy was not covered by her insurance, and the injections did not work. (Tr. 71-72). She could stand for about ten (10) minutes before a shooting pain in her back, neck, and legs would start that would cause numbness in her legs. (Tr. 68). When this happened, it would be an all day occurrence. (Tr. 68). Walking short distances, getting out of the car, and using stairs increased her pain. (Tr. 68).

At the time of her hearing, she was working about sixteen (16) hours a week as a self-employed residential house cleaner, which involved laundry, vacuuming, dishwashing, cleaning the counters and bathrooms, and light dusting. (Tr. 62-63). She testified that she had only one (1) client, and that it took her sixteen (16) hours to do the work for this client because she could not stay on her feet or sit for too long as her neck, back, shoulders, and legs became painful and caused her to lose

her balance. (Tr. 63). Her hands would also go numb and cause her to drop things. (Tr. 64). An average day of house cleaning consisted of being able to stand up for about ten (10) minutes, then needing to sit or lie down for about twenty (20) to twenty-five (25) minutes before resuming cleaning. (Tr. 64, 69). On days when she was not working, she would wash her dishes and sit. (Tr. 64). She had others help her with household chores, grocery shopping, and driving. (Tr. 65).

Regarding her anxiety, Plaintiff testified that she was taking Xanax. (Tr. 72). She stopped attending mental health treatment because the doctor "was just drugging [her] up so much, and [she] didn't want to be on all th[ose] drugs." (Tr. 73).

## **MEDICAL RECORDS**

On April 9, 2012, David Hutz, M.D. completed a physical Residual Functional Capacity form based on Plaintiff's medical records. (Tr. 85-86). Dr. Hutz opined Plaintiff could: occasionally lift and/ or carry twenty (20) pounds; frequently lift and/ or carry ten (10) pounds; stand and/ or walk and sit for about six (6) hours in an eight (8) hour workday; engaged in limited pushing and pulling; occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. (Tr. 85-86). Dr. Hutz opined that

7

Plaintiff had no manipulative, visual, or communicative limitations, but that she

should avoid concentrated exposure to extreme cold, wetness, and hazards such as

machinery and heights. (Tr. 86).

On April 12, 2012, Plaintiff had an appointment with Dr. Stone at Hershey

Medical Center for ongoing and chronic back, neck, and leg pain. (Tr. 250). She

had difficulty walking more than four hundred (400) feet; if she did, she would

have pain in her back and legs that would force her to stop walking. (Tr. 250).

Lying down in a certain position alleviated her pain, and prior injections gave her

no relief. (Tr. 250). Her medications included Oxycodone, Naprosyn,

Alprazolam, and Ibuprofen. (Tr. 250). Plaintiff's physical exam revealed the

following: an appropriate affect; fluent speech; intact long term memory; full

range of motion in her neck in flexion and extension; 5/5 upper extremity strength

in all major muscle groups in the back with pain on extension only; 4/5 lower

extremity strength in her iliopsoas bilaterally, her right quadricep, anterior tibiallis

on the right, and her bilateral biceps femoris; 5/5 lower extremity strength in her

left quadricep, left angerior tibiallas, and her bilateral gastrocnemius; a sensory

examination diminished to pinprick in the pretibial area of the right leg and the

dorsal aspect of the left foot; deep tendon reflexes that were 2+ and brisk in the

knees and 1+ and equal in the ankles; a negative straight leg raising test; and no

8

spasticity. (Tr. 251). It was noted that, neurologically, she had findings of nondermatomal numbness in the right leg and diffuse weakness in the right lower extremity to a mild degree. (Tr. 251). Dr. Stone suspected Plaintiff had neurogenic claudication. (Tr. 251). It was noted that if the stenosis was causing the claudication, it was unlikely to resolve spontaneously, but instead Plaintiff would need to have surgery. (Tr. 251). Dr. Stone ordered a flexion-extension x-ray scan and a lumbar spine CT scan, and prescribed physical therapy. (Tr. 251).

On April 17, 2012, Plaintiff underwent a flexion-extension x-ray of her lumbosacral spine. (Tr. 245). The results were that Plaintiff had: chronic moderate degenerative disc disease at L5-S1; mild degenerative disc disease at L4-L5; minimal anterior spondylolisthesias at L5-S1 and L4-L5, with the spondylolisthesis slightly more pronounced during extension; and minimal spondylosis at the L2 and L4 levels. (Tr. 245). The impression was that Plaintiff had degenerative disc disease and minimal spondylolisthesis. (Tr. 245).

On April 17, 2012, Plaintiff also underwent a CT scan of the lumbar spine for an evaluation of spinal stenosis. (Tr. 246). The impression was that Plaintiff had spinal stenosis, moderate central disc protrusion, hypertrophy of the ligamentum flavum, a moderate amount of facet arthropathy, minimal anterior spondylolisthesis, and bilateral foraminal stenosis at L4-L5; a moderate amount of

facet arthropathy, generative spurs extending from the facet joint into the spinal canacl with narrowing of the neural foramina, a mild central disc protrustion, mild spinal stenosis, mild spondylolisthesis, and bilateral foraminal stenosis at L5-S1; mild scoliosis with convexity towards the right; and minimal central disc bulging or protrusion at the L3-L4 level. (Tr. 246-247).

On April 25, 2012, Plaintiff had an appointment with Donald Stone, D.O. at Hershey Medical Center for a follow-up after the imaging studies. (Tr. 248). Plaintiff continued to have pain in her neck, back, and legs. (Tr. 248). Dr. Stone noted that the April 17, 2012 CT scan showed a collapsed disc space at L5-S1 with the presence of severe central canal stenosis at L4-L5. (Tr. 248). Dr. Stone explained that Plaintiff would be a candidate for a laminetomy or laminotomy for decompression, but that these procedures might aggravate her instability. (Tr. 248). Dr. Stone explained that the goal of this surgery was to prevent progression of her symptoms, but would not necessarily provide symptomatic relief. (Tr. 248).

On May 3, 2012, Plaintiff had an appointment with Tae Shynn, M.D. at Northeast Counseling Services for depression and anxiety treatment. (Tr. 257). Plaintiff reported that she had been experiencing a decreased appetite, shakiness, heart palpitations, panic attacks, and difficulty driving and with social settings due to panic attacks. (Tr. 257). Her prior psychiatric history noted that she was

diagnosed with Panic Disorder in 2012 by Ellen Greenberg, and had been prescribed Paxil and Xanax. (Tr. 258). Dr. Shynn's impression was that Plaintiff had Panic Disorder with Agoraphobia. (Tr. 264). Plaintiff agreed to begin individual psychotherapy with the goal to decrease panic, improve her overall coping skills, and agoraphobic. (Tr. 260, 264). Plaintiff was scheduled for a follow-up appointment in three (3) weeks. (Tr. 264).

On May 10, 2012, Sara Cornell, Psy.D., completed an Adult Psychological Evaluation of Plaintiff with the purpose of the evaluation to consider the presence of a mental disorder, learning problems, severe excesses of personality, or other psychological factors that could impact her ability to perform work or school-related activities. (Tr. 271). Plaintiff's self-reported symptoms included the following: panic attacks with a racing heart, shortness of breath, dizziness, shaking, and sweating that occurred when communicating or interacting with others, in public places, or in crowds; an inability to leave her home without accompaniment; sadness, crying, lethargy, anhedonia, avolition, worthlessness and hopelessness feelings, loneliness, and social isolation; mood swings; a lack of patience; anger due to her inability to work; pessimism, low self-esteem, poor self-efficacy, self-criticism, discouragment, and feelings of inadequacy; poor short-term memory; a minimal appetite; and poor sleep. (Tr. 271-272). Plaintiff's

11

examination revealed the following: poor hygiene; orientation to time, place, and person; a flat affect and dysphoric mood; spontaneous, clear, coherent, and logical speech with a low volume; relevant and goal-directed thought processes; fair attention and concentration; poor judgment and lack of insight into her difficulties; an average intellectual ability; fair eye contact and social skills; unremarkable gait, posture, and general movements; and no hallucinations, delusions, or bizarre behavior. (Tr. 271-272). Dr. Cornell's impression was that Plaintiff had Panic Disorder with Agoraphobia and Major Depressive Disorder, Severe without Psychotic Features. (Tr. 272). She opined Plaintiff had: no restrictions in her ability to understand, remember, and carry out short and simple instructions; slight restrictions in her ability to understand, remember, and carry out detailed instructions; moderate restrictions in her ability to make judgments on simple work-related decisions and to interact appropriately with the public; marked restrictions in her ability to interact appropriately with supervisors and co-workers and in her ability to respond appropriately to changes in a routine work setting; and extreme restrictions in her ability to respond appropriately to work pressures in a usual work setting. (Tr. 268). Her ability to socialize was affected by her mental health impairments which caused Plaintiff to be isolated without a support system. (Tr. 269). Dr. Cornell recommended that Plaintiff continue psychiatric

and psychological treatment, and stated that her prognosis was guarded. (Tr. 273).

On June 7, 2012, Linda Lease, Ph.D. completed a Psychiatric Review Technique and mental Residual Functional Capacity form. (Tr. 84-84, 87-88). Dr. Lease opined that for Listing 12.06, Anxiety-Related Disorders, Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 83). She opined that Plaintiff was not significantly limited in her ability to: carry out very short and simple or detailed instruction; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places of use public transportation; and set realistic goals or make plans independently of others. (Tr. 87-88). She opined that Plaintiff was moderately limited in her ability to: work in coordination with or in proximity to others without being distracted by

13

them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (Tr. 88). In the "Additional Information" section, Dr. Lease noted that Plaintiff had moderate limitations in concentration, persistence, or pace; social interaction; and adaptation in regard to typical work situations. (Tr. 88). She concluded her opinion by stating that Plaintiff was capable of simple and routine work despite mental impairments. (Tr. 88).

On June 14, 2012, Plaintiff had an appointment with William Welch, M.D. at University of Pennsylvania's Department of Neurosurgery for low back pain. (Tr. 286). Plaintiff reported that her pain was located in her neck and back and radiated down both of her legs. (Tr. 286). Plaintiff also reported that she experienced numbness and tingling, a burning sensation in her legs, that movement was a precipitating factor and symptoms worsened with walking, that her symptoms improved with rest, and that physical therapy had not helped her pain, but epidural injections did. (Tr. 286). Her motor function testing revealed 4/5 muscle strength bilaterally in her deltoids, biceps, triceps, wrist flexors and

extensors, iliopsoas, dorsi-flexion, EHL, Gastrocnemius, and the anterior tibialis. (Tr. 288). She was a 3/5 strength in her hand intrinsics, her right quadricep, and her plantar flexion. (Tr. 288). The following reflexes were all normal bilaterally: biceps, brachioradialis, triceps, patellar, and achilles. (Tr. 289). She had positive heel and toe walking bilaterally. (Tr. 289). The Hoffman sign and Ankle Clonus were both absent. (Tr. 289). Her gait was antalgic, she had a positive straight leg raising test bilaterally, her range of motion in her lumbar spine was limited, and her mood, affect, and orientation were normal. (Tr. 289). Plaintiff was assessed as having Lumbar Stenosis and probably peripheral neuropathy. (Tr. 289). The plan was that she was a surgical candidate for an L4-L5 laminectomy, but that there were significant risks. (Tr. 289).

On November 20, 2012, Plaintiff had an appointment with Dr. Stone for ongoing pain that was "head to toe," tingling in her hands and feet, stiffness all the time, swelling in the extremities, and difficulty walking. (Tr. 313). Her physical exam revealed: that her neck was tender and had muscle rigidity; she had limited range of motion in all fields with tightness bilaterally with paraspinal multiple bilateral trigger points; good judgment and insight; an anxious, depressed, and agitated mood; normal recent and remote memory; tenderness and limited range of motion in her neck, shoulders, wrists, digits, hips, knees and ankles; edema and

15

varicosities in her extremities; normal gait and station; grossly intact cranial

nerves and sensation; and a normal facial motor strength. (Tr. 315). Plaintiff was

diagnosed with Fibromyalgia, Spinal Stenosis in the cervical region, neuralgia,

and chronic pain syndrome. (Tr. 315).

On March 14, 2013, Plaintiff had an appointment with Dr. Stone for right

side pain in her groin, hip, and leg causing difficulty walking, moving, and driving

that had been occurring for the prior one and a half (1 ½) weeks. (Tr. 343).

Plaintiff's physical exam revealed: a thought process and content that was difficult

at times; rapid speech; abnormal recent memory; tenderness and limited range of

motion in her right hip, groin, and lumbar area; irregular gait; pain with sitting and

movement; and limited ambulation. (Tr. 344). Plaintiff was diagnosed with

anxiety, chronic pain syndrome, and Depressive Disorder. (Tr. 345).

On March 28, 2013, Dr. Stone filled out a Residual Functional Capacity

form for Plaintiff. (Tr. 335-337). He opined that Plaintiff had medical conditions

that had resulted in permanent disability as of January 22, 2012, including: spinal

stenosis with a poor prognosis and degenerative disc disease with herniated discs

causing bilateral lower extremity parethesia with a possibility for improvement

with surgical intervention. (Tr. 335). He opined that Plaintiff would be unable to

lift, bend, sit for long periods of time, stand for long periods of time, or walk

extended lengths/ distances.  (Tr. 336).  He clarified his opinion, stating that Plaintiff would be temporarily totally disabled "until surgery is performed and she has recovered."  (Tr. 337).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07. Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant

19

numbers either in the region where such individual lives or in
several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2016. (Tr. 36). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of January 1, 2012. (Tr. 36).

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "panic disorder, anxiety, major depressive disorder, lumbar disc disease, and cervical disc disease (20 C.F.R. 404.1520(c) and 416.92(c))." (Tr. 37).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr.37-39).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 39-43). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. [Plaintiff] is limited to occupations that

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

require no more than occasional stooping, kneeling, crouching or crawling. [Plaintiff] can understand, remember and carry out simple instructions in an environment free of fast-paces production requirements involving only simple work related decisions with few workplace changes. Lastly, [Plaintiff] can have no more than occasional interaction with supervisors, coworkers and the public.

(Tr. 39).

At step five of the sequential evaluation process, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 44).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between January 1, 2012, the alleged onset date, and the date of the ALJ's decision. (Tr. 45).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ improperly assigned little weight to the opinion of the treating physician, which, if credited, would have compelled a finding of disability; (2) the ALJ improperly assigned little weight to the opinion of the consultative psychologist which, if credited, would have compelled a finding of disability; (3) the ALJ failed to consider relevant and probative evidence, which, had it been considered, would have

supported a finding that Plaintiff was limited to sedentary exertion and thus

disabled under the regulations; and (4) the ALJ failed to present a hypothetical

question containing all of Plaintiff's limitations to the VE. (Doc. 16, pp. 3-18).

Defendant disputes these contentions. (Doc. 17, pp. 18-35).

### 1. **Medical Opinion Evidence**

Plaintiff argues that the ALJ erred in assigning little weight to the opinions

of Dr. Stone and Dr. Cornell because they were consistent with and supported by

the record and Plaintiff's impairments. (Doc. 16, pp._____).

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g.,

Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true

when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit

24

in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Additionally, the Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting" the medical evidence.).

Regarding the relevant medical opinion evidence, the ALJ gave great weight to several opinions. He gave great weight to the opinions of two (2) state agency, non-examining physicians, namely Dr. Lease and Dr. Hutz. (Tr. 43). He reasoned that great weight should be given to Dr. Lease's opinion that Plaintiff was capable of performing simple routine work because this opinion was consistent with the evidence from Northeast Counseling Services and reflective of Plaintiff's Global Assessment of Functioning scores. (Tr. 43). He gave great weight to the opinion of Dr. Hutz, stating, "The undersigned does not find that Dr. Hutz is wrong in his assessment. Based on the medical evidence, only limitations noted above are supported and Dr. Hutz's review of the file reflects the same

26

analysis." (Tr. 43).

The ALJ gave little weight to the opinion of Dr. Cornell rendered because they were "simply unsupported to include her assessment of a GAF of 45. Dr. Cornell's assessment is based on a one-time examination that occurred shortly after [Plaintiff] sought services for mental treatment and without any course of therapy." (Tr. 43). The ALJ also gave little weight to the opinion of Dr. Stone, Plaintiff's treating physician who opined that Plaintiff was temporarily totally disabled due to spinal stenosis and degenerative disc disease because "little in the file supports any notion of an inability to work at this time" and because "Dr. Stone lists the disability as temporary meaning [Plaintiff] will likely recover is she does elect surgery." (Tr. 43).

Upon review of the entire record and the ALJ's RFC determination, it is determined that the ALJ improperly afforded great weight to the opinion of Dr. Hutz, a state agency, non-examining physician, in reaching the RFC determination because the state agency examination records indicate that the whole medical record was not available for review. (Tr. 80-90). While the medical records up to the date Dr. Hutz rendered an opinion on April 9, 2012 were included, what was not reviewed, and therefore excluded from Dr. Hutz's review, were the medical records from the exams that took place after Dr. Hutz rendered this opinion. (Tr.

80-86, 286-289, 313-315, 335-337, 343-345).  More significantly, the medical

opinion that was not included as part of Dr. Hutz's review of Plaintiff's medical

records was the opinion rendered by Dr. Stone, the treating physician, that Plaintiff

was temporarily disabled due to spinal stenosis and degenerative disc disease.  (Tr.

80-86, 335-337).  As discussed, in order for the ALJ to properly give any weight to

a medical opinion, the entire medical record must have been available for and

reviewed by the non-examining, non-treating physician.  See Sassone, 165 F.

App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to

support the ALJ's RFC determination that the plaintiff could perform light work,

even though this determination was based largely on the opinion of one medical

expert, because the medical expert's opinion was supported by the medical

evidence of the entire record).  However, in the case at hand, the entire medical

record was not available to the non-examining, non-treating physician, namely Dr.

Stone, whose opinion was afforded great weight by the ALJ.

Therefore, because the opinion of the state agency physician was not well-

supported by the entire record as it did not include a review of all medical evidence

and opinions, substantial evidence does not support the RFC determination.  As

such, remand on this basis is necessary, and this Court declines to address

Plaintiff's remaining assertions.

## **CONCLUSION**

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: July 26, 2016

**/s/ William J. Nealon**
**United States District Judge**